[No. 13660.   Department Two.   April 3, 1917.]

L. S. HORWITZ *et al., Respondents*, v. UNITED STATES
FIDELITY & GUARANTY COMPANY, *Appellant*.[1]

INSURANCE—BURGLARY INSURANCE—PREMATURE ACTION—POLICY—WAIVER. A provision in a policy of burglary insurance that no suit shall be commenced until three months after the particulars of the loss have been furnished the company is only for the purpose of allowing the company to investigate the loss, and is satisfied as soon as the company reaches and announces its conclusion, after which suit may be brought within the three months.

SAME—BURGLARY INSURANCE — SUFFICIENCY OF PROOFS — WAIVER. The refusal to pay a loss upon a policy of burglary insurance after proofs have been furnished, without specific objection to the proofs, is a waiver of any informality or defects in the proofs.

SAME—BURGLARY INSURANCE—POLICY—KEEPING ACCOUNTS. A requirement in a policy of burglary insurance that the accounts of the assured be so kept that the actual loss could be accurately determined therefrom, is complied with, where the assured was doing a cash business, additions to the inventoried stock were indicated by notations on pads bound in book form showing the article and price, sales slips showed the articles sold, and the stock on hand was ascertained by checking the one with the other.

SAME. Such slips are not shown to have been faked or inaccurate from the fact that they were not shown to an adjuster, where they were kept in Yiddish by a manager, and proven translations were introduced in evidence without contradiction.

SAME — BURGLARY   INSURANCE—OVERVALUATIONS—EVIDENCE—SUFFICIENCY. An application for burglary insurance is not shown to

[1]Reported in 164 Pac. 77.

have overstated the value of the stock at $8,000, from the fact that it sold at a bankrupt sale at $3,500, where there was evidence that the purchaser from the trustee was paid between eight and nine thousand dollars and that it inventoried at $9,750 at current cost prices.

SAME—BURGLARY INSURANCE—TITLE OF ASSURED—EVIDENCE—SUFFICIENCY. The assured's ownership of a stock of goods covered by burglary insurance is not put in doubt by mere conjecture as to their ability to pay for it, where their ownership was as probable as any other, and was supported by the direct evidence.

SAME—BURGLARY INSURANCE—EVIDENCE OF LOSS—SUFFICIENCY. In an action upon a policy of burglary insurance, suspicious circumstances tending to show that no burglary was committed are insufficient to require denial of recovery, where many of the circumstances were explained, others rested upon contradicted testimony, and the inferences sought to be drawn are opposed to the direct and positive testimony of the plaintiffs, and the testimony on the whole sustains the judgment.

HOLCOMB, J., dissents.

Appeal from a judgment of the superior court for Whatcom county, Pemberton, J., entered January 19, 1916, upon findings in favor of the plaintiffs, in an action on a policy of burglary insurance, tried to the court. Affirmed.

Romaine & Abrams, for appellant.

S. M. Bruce, for respondents.

FULLERTON, J. — The respondents brought this action against the appellant to recover on a policy of burglary insurance. The cause was tried by the court sitting without a jury. The court made findings of fact and conclusions of law favorable to the respondents, and entered judgment accordingly. This appeal is from the judgment so entered.

The first assignment of error is that the action was prematurely commenced. The policy provided:

"No suit shall be brought under this policy until three months after the particulars of the loss as required herein have been furnished to the company, nor at all unless commenced within twelve months after the date of the burglary."

The particulars of the loss were furnished the company on January 9, 1915, and the action was commenced by the service of a summons on March 9, 1915, a time within the limitation of three months. But the record shows that the company, on the day it received the particulars of the loss, notified the respondents by letter that it disclaimed liability and refused payment, making no objection to the form or the sufficiency of the proofs. Since the only purpose of this provision of the policy is to allow the company time to investigate the particulars of the loss and the extent of its liability without being harassed with the burdens of a suit, the requirement is satisfied when the company reaches and announces its conclusion thereon. *Cascade Fire & M. Ins. Co. v. Journal Pub. Co.,* 1 Wash. 452, 25 Pac. 331.

It is suggested that the refusal to pay may have been because of the insufficiency of the proofs, but the announcement of a refusal to recognize liability for a loss after proofs have been furnished, without a specific objection on that ground, is a waiver of any informality or defects in the proofs. *Cushing v. Williamsburg City Fire Ins. Co.,* 4 Wash. 538, 30 Pac. 736.

The policy provided that the company should not be liable if the accounts of the assured were not so kept that the actual loss could be accurately determined therefrom. The insured property consisted of a stock of "ladies ready-to-wear furs, raw furs, feathers, cloaks, suits and furnishing goods." The loss claimed was for furs only. These were, in part, purchased from a person who had purchased them at a bankrupt sale, and were, in part, furs that had been purchased subsequently to the original purchase and added to the stock. The respondents conducted a cash business, and seem to have kept no regular book of account. An inventory was taken at the time the store was opened, and subsequent additions to the stock were indicated by notation on pads bound in book form which showed the article purchased and the price paid therefor. When sales were made, slips showing the article

sold were also made out. The stock on hand was ascertained by checking the one with the other. It is contended that this is not a sufficient compliance with the requirement of the policy. But we think it is. The requirement is not that regular books of account be kept, but only that the accounts of the assured be so kept "that the actual loss may be accurately determined therefrom." Clearly these would show the stock on hand at the time of the burglary. *Malin v. Mercantile Town Mut. Ins. Co.*, 105 Mo. App. 625, 80 S. W. 56.

The appellant argues that the evidence shows that these slips were faked, that is, manufactured for the occasion subsequent to the alleged loss. This is founded on the testimony of an adjuster for the appellant, sent to investigate the loss, who says that no such slips were shown to him. The slips in evidence are admittedly copies or, perhaps better, translations from the originals, which were written in Yiddish by the father of the respondents, who had the active management of the business. The originals were not called for by either side, nor were they introduced in evidence, but the accuracy of the copy or translation was testified to by the party who made them and no effort was made to contradict him. We do not think these facts show that they were either faked or inaccurate, or that the trial court was not justified in finding that sufficiently accurate accounts had been kept.

In the application for the insurance, the respondents represented that the value of the stock of goods on which the insurance was desired was $8,000. It is contended that is such a false representation of the true value as to avoid the policy. The contention is rested largely on the fact that the goods were formerly the property of the respondents' father, who became bankrupt, and were sold by the trustee in bankruptcy to one Schuman, a cousin of the respondents, for the sum of $3,500. But it was testified by one of the respondents that they paid Schuman for the goods between $8,000 and $9,000, and that the goods inventoried at the time of the

purchase—valuing them at the current cost prices—in the sum of $9,750.74. It was testified, also, that the stock had been augmented by additional purchases between the time of the purchase from Schuman and the time of the application, and that, at the time of the application, it was of no less value than it was when the inventory was taken. But it is common knowledge that stocks of goods sold under compulsory process issued out of courts sell at a sacrifice. Indeed, it is well known that men engage in the business of buying bankrupt stocks with the idea of profit; and the fact that this stock sold at so high a price at the bankrupt sale rather supports than contradicts the testimony that its inventoried value was in excess of $9,000. But, be this as it may, we cannot say that the good faith of the transaction was so far impeached as to require a holding that the goods were overvalued.

Another contention is that the respondents were not the real owners of the goods and had no insurable interest therein. But as to this the direct testimony was all the other way, and nothing against it but circumstances, more or less suspicious perhaps, but seemingly as consistent with one theory as the other. For example, it was shown that the respondents were young men, aged, respectively, 23 and 24, and were following pursuits not usually very lucrative; that the fire insurance on the goods was carried in the name of Schuman, and that the father had at different times referred to the goods as his own. It is thought that the respondents could not have saved from their earnings a sufficient sum of money to buy the goods at the price they claimed to have paid in cash for them, and it is concluded that the father must have been the owner and held the goods in the name of his sons for some ulterior purpose. But the record presents presumptions equally strong supporting a contrary view. The father was in charge of the store, and naturally would speak to customers and others coming into the place as if the property was his own. This is the custom of the trade. One

would gather from the pronouns used by the merest tyro in the largest department store that he was the proprietor of the establishment. Again, ownership in the father seems as improbable as ownership in the sons, if the matter is to be tested by ability to buy. As we have before indicated, the goods for the greater part were the property of the father, who became a bankrupt, and were sold, ostensibly at least, to Schuman for $3,500 in cash at a bankrupt sale. If we conclude that Schuman was a dummy purchaser and that the cash sum paid was the money of the father, it is difficult to understand how he could have become possessed of so large a sum without the knowledge of his creditors. The business in which he was formerly engaged was not large, and he could hardly have retained so large a sum out of his business without exciting suspicion and inquiry from those trusting him with goods, who must have exercised the usual vigilance displayed in such cases. Clearly we think the greater probability is that the sons could procure the necessary money with more ease than could the father. But after all, these are mere conjectures, opposed to the presumptions of honesty which obtain in every case, and are contrary to the direct and positive testimony of the parties to the transactions. We cannot think that they overcome the findings of the trial court, who heard and saw the witnesses.

Lastly, it is said that there was in fact no burglary, and consequently no loss under the policy. This was the point to which the evidence was principally directed, and the court allowed it to take a wide latitude. We do not feel called upon, however, to discuss it at length. There were some suspicious circumstances. There was evidence tending to show that no trace of the thieves was ever found; that the door through which the thieves apparently entered the store could hardly have been forced without greater injury to the surrounding parts than was shown; that the respondents frequently visited the store and carried away suit cases which appeared to be heavily laden; that a bunch of keys was found

near the store entangled in which was a short piece of thread similar in appearance to a spool of thread found in a drawer of a sewing machine in the store; that a key was found in the lock of the door twisted and bent, which was similar in appearance to a key stock purchased a few days before by a stranger, and that the father discovered tracks on the morning of the burglary leading from the open back door of the building which were not visible to searchers examining the place later. There were other similar circumstances of more or less weight, but a careful reading of the whole fails to convince us that no loss by burglary was in fact sustained. Many of the circumstances were explained; others rest on contradictory testimony, and the inferences sought to be drawn therefrom are opposed to the direct and positive testimony on behalf of the respondents.

Nor are the circumstances relied upon inconsistent with good faith. Burglars are not always caught. The amount of force required to open a locked or bolted door depends upon the strength of the lock, and the damage to the door would vary in proportion to the force necessary to be used. It is not inconsistent with good faith that the owners of a store should frequently visit it, nor that in going and coming they should carry cases; that the suit cases carried by these young men were ever heavily laden is denied by them, and nothing in the record shows that any goods taken from the store were found in, or traced to, the possession of either of them. It is not improbable that a burglar entering a store would search the drawers of a sewing machine and, if he found a bunch of keys, take it out with the idea that the keys might unlock other more secret places. Nor is it strange that he would drop the keys the moment he was through with them, that no unnecessary evidence might be found on his person in case he should be caught. And surely it is just as possible that a thread could adhere to them when carried by the burglar as it is possible for it to adhere when carried by the proprietor or manager of the place entered. The circumstance of the

bent and twisted key in the lock of the door has weight only as a link in the chain of circumstances. It was not traced to the possession of the manager of the store, and the merchant who sold a similar key stock a few days before would not say that the purchaser was one of the proprietors. So with the tracks: The father was the first one at the store in the morning after the burglary and looked when the frost was still on the ground, and says they were plainly visible. That others later did not find them would not be strange.

But we need not pursue the inquiry. In our opinion, the trial court determined the questions of fact according to the preponderance of the evidence, and did not err in his conclusions as to the law.

The judgment is affirmed.

MOUNT and PARKER, JJ., concur.

HOLCOMB, J. (dissenting)—To my mind, the circumstantial evidence of respondents, tending to establish that a burglary was committed, was greatly overbalanced by the circumstantial proof and logical deductions to the contrary. I am therefore convinced that the evidence, by a great preponderance, shows that no burglary was committed. Believing that the judgment should be reversed, I dissent.